J-S65001-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.E.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.D., FATHER | No. 876 EDA 2015 |

Appeal from the Decree and Order Entered February 9, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000225-2013
CP-51-DP-0045396-2008

BEFORE: BENDER, P.J.E., SHOGAN, J., and JENKINS, J.

MEMORANDUM BY BENDER, P.J.E.:            **FILED NOVEMBER 04, 2015**

A.D. ("Father") appeals from the decree entered February 9, 2015, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated his parental rights to his minor daughter A.E.D. ("Child"), born in July of 2005. In addition, Father appeals from the order entered that same day, which changed Child's permanency goal to adoption.[1] We affirm.

The record reveals that Child first entered foster care in 2008, due to, *inter alia*, domestic violence between Mother and Father, and Mother's mental health issues. Father became uninvolved in Child's life, and failed to comply with Child's permanency plan. Mother did comply with the permanency plan, and was successfully reunited with Child on June 21,

---

[1] The parental rights of Child's mother, S.J. ("Mother"), were terminated by a separate decree. Mother is not a party to the instant appeal.

2011. The trial court summarized the subsequent factual and procedural history of this matter as follows:

> On December 9, 2011, and December 20, 2011, DHS visited [M]other's home but nobody answered the door. On January 2, 2012, DHS visited [M]other's home again. Child's Father answered the door and stated that he did not know mother's whereabouts. Father appeared to be under the influence of drugs. DHS later confirmed that Child's mother was incarcerated. On January 3, 2012, DHS applied for an [Order of Protective Custody ("OPC")]. DHS obtained an OPC and Child was temporarily committed to DHS. At the shelter care hearing on January 5, 2012, Child's temporary legal custody was transferred to DHS and Child was ordered to be placed in foster care. Father was granted weekly supervised visitation with Child at the agency. On January 19, 2012, Child was adjudicated dependent and placed with maternal grandmother. On April 11, 2012, at a permanency review hearing, the trial court found Father non-compliant. On April 18, 2012, at another [Family Service Plan ("FSP")] meeting, Father's goals were: to provide adequate and safe living conditions by locating and occupying suitable housing with space, heat, and all other operable utilities, to stabilize mental problems by complying with treatment, to obtain and complete job training, and [to] maintain employment. As part of the employment objective, Father was required to complete five job applications or obtain interviews. Father also had to maintain his relationship with his Child by participation in placement activities and regular visitation. On July 2, 2012, at a permanency review hearing, Father was found non-compliant with FSP objectives. The trial court then ordered a[n] FSP meeting to take place within 30 days, and yet again, at a permanency review hearing held on October 1, 2012, Father was found to be non-compliant with his FSP.
>
> On December 3, 2012, at a permanency review hearing, the court found that Child was moved to a Northeast Treatment foster home. . . . On April 16, 2013, DHS filed a petition for involuntary termination of Father's parental rights.[2] At the

_____

2 A petition to change Child's permanency goal to adoption was filed on the same day.

permanency review hearings on May 2, 2013, and September 11, 2013, the trial court found Father to be again non-compliant with his FSP objectives. The court also found that DHS made reasonable efforts to finalize Child's permanency plan. At the permanency review hearing on September 11, 2013, Father was once again non-compliant with his FSP objectives. The court ordered a [Parent Locator Search] as to Child's Father. It was found that Father had an active bench warrant since 2012. He was running from the law, avoiding any contact with the judicial system.

At the permanency review hearings on January 14, 2014, and March 17, 2014, the trial court found that DHS made reasonable efforts to finalize Child's permanency plan. At the permanency review hearing on July 24, 2014, the trial court found Father continued to be non-compliant with his FSP objectives. Furthermore, DHS explored the voluntary relinquishment of parental rights with Father, but Father refused. . . . Father was in Philadelphia County [J]ail, and at times in solitary confinement. The trial court had ordered that Father be brought to court, but it was not done until February 9, 2015.

Trial Court Opinion, 5/8/2015, at 3-4 (citations to the record omitted).

A termination and goal change hearing was held on February 9, 2015. During the hearing, the trial court heard the testimony of the Northeast Treatment Center Foster Care Case Manager, Markel James; the DHS social worker, Rimoini Peace; and Father. Following the hearing, the court entered its decree terminating Father's parental rights to Child involuntarily, and its order changing Child's permanency goal to adoption. Father timely filed a notice of appeal on March 11, 2015, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3]

_____

[3] We note that Father improperly filed only one notice of appeal from both the termination decree and the change of goal order. *See* Pa.R.A.P. 341,
*(Footnote Continued Next Page)*

- 3 -

Father now raises the following issue for our review. "Did the trial court err in determining it was in the best interest of the child to terminate [F]ather's parental rights." Father's brief at 4.

Father argues that DHS failed to present clear and convincing evidence that his parental rights should be terminated. *Id.* at 6-11. Father emphasizes that he is bonded with Child, and that the trial court was presented with "no expert testimony, no bonding evaluation and no parent capacity evidence. There was scant evidence regarding the bond or lack of bond between the child and the father." *Id.* at 9-10.[4]

We consider Father's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported

_(Footnote Continued)_ _____

Note ("Where, however, one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."). However, we decline to quash Father's appeal, as we discern no prejudice stemming from Father's procedural misstep.

[4] Father also purports to challenge the order changing Child's permanency goal to adoption. Father's brief at 3. However, Father's brief on appeal contains no substantive discussion with respect to this issue, nor does it contain any citation to relevant authority. We conclude Father has failed to preserve any challenge to the change of goal order for our review, and we address only the decree terminating Father's parental rights. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa. Super. 2010)) ("'[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.'").

- 4 -

by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.

- 5 -

Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(1) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > ***
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(1).[5] To

---

[5] While Father's argument is centered on Section 2511(b), it appears that he may also be attempting to challenge Section 2511(a). **See** Father's brief at 11. We note that Father has preserved his challenge to Section 2511(a) for our review, by including this claim in his concise statement of errors complained of on appeal.

meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008) (citing **In re Adoption of R.J.S.**, 901 A.2d 502, 510 (Pa. Super. 2006)). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). **Id.** (quoting **In re Adoption of Charles E.D.M.**, 708 A.2d 88, 92 (Pa. 1998)).

This Court has emphasized that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." **In re B.,N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting **In re C.M.S.**, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." **Id.** (citation omitted).

Instantly, the trial court found that Father had minimal contact with Child during her more than three years in foster care, and that Father has not seen Child at all in over two years. Trial Court Opinion, 5/8/2015, at 6.

The court noted that Father never obtained visitation with Child, and made no effort to involve himself in Child's life. *Id.* Thus, the court concluded that Father refused and failed to perform his parental duties for a period of at least six months prior to the filing of the petition to terminate his parental rights. *Id.*

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion. Northeast Treatment Center Foster Care Case Manager, Markel James, testified that he became involved in this case in April of 2012. N.T., 2/9/2015, at 22. To the knowledge of Mr. James, Father had no involvement in Child's life at that time. *Id.* at 35. Mr. James did not recall Father attending any of the court hearings in this matter. *Id.* at 26. However, Mr. James stated that he saw Father "a few times" while transporting Child to and from school, and that "we communicated about the case . . . ." *Id.* at 22. Mr. James explained that Father was believed to be living at his mother's home, which was near Child's school, and that "sometimes he would be there, sitting on the steps or standing at the door." *Id.* at 40. Mr. James recalled that the first time he saw Father, in approximately 2013, they had "an impromptu meeting," during which Father "stated that he had a legal situation, therefore, he wouldn't be able to make himself available for DHS or visits." *Id.* at 23-24. Mr. James noted that Father never participated in a visit with Child during

his time on the case, and that he was not aware of Child having any contact with Father at all after the impromptu meeting in 2013. *Id.* at 22, 37.

Father testified that he was "unable to attend any FSPs or whatever . . . because I had legal issues regarding being wanted by the law," and that his legal issues also prevented him from parenting Child. *Id.* at 46, 51-52. Father agreed that he would not be attending the termination and goal change hearing if not for the fact that he currently is incarcerated. *Id.* at 51. Father explained that he was incarcerated approximately ninety days prior to the hearing. *Id.* at 6. Father claimed that he was "at a preliminary hearing stage" in his current criminal case, but that he was "quite sure" that he would be released. *Id.* at 53-54.

Accordingly, the record supports the finding of the trial court that Father has refused or failed to perform parental duties for a period of at least six months prior to the filing of the termination petition on April 16, 2013. Father did not participate in a visit with Child during the relevant six-month period. At best, the record indicates that Father encountered Child on some unspecified date in 2013, and then never saw her again. Moreover, Father's history of refusing to parent Child stretches all the way back to Child's first stay in foster care from 2008 until 2011. Because Father has failed to display even a passive interest in Child, he is not entitled to relief.

We next consider whether the trial court abused its discretion by terminating Father's parental rights under Section 2511(b). We have discussed our analysis under Section 2511(b) as follows:

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the trial court found that Father and Child do not share a parent/child bond, and that Child will not suffer irreparable harm if Father's parental rights are terminated. Trial Court Opinion, 5/8/2015, at 9. The court emphasized that Father has failed to take an active role in Child's life, and that Father has not even seen Child in over two years. *Id.* at 9-10. The

court concluded that Child is in need of permanency, and that adoption is in her best interest. *Id.* at 10.

We again conclude that the trial court did not abuse its discretion. Mr. James testified that, during Father's brief encounter with Child in approximately 2013, Child "was excited to see [Father]. She ran up to him, jumped into his arms. They hugged. They talked. She seemed happy." N.T., 2/9/2015, at 37. However, as observed by the trial court, Father has played a minimal role in Child's life during her time in foster care, and has not seen Child at all since the impromptu meeting with Mr. James. While Child may harbor some affection for Father, it is unlikely that the two of them share a parent/child bond. As this Court has explained,

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (citation and quotation marks omitted).[6]

_____

[6] Notably, in *K.K.R.-S.*, this Court also observed that a court in a termination proceeding "is not required by statute or precedent to order a

*(Footnote Continued Next Page)*

Moreover, to the extent that Child and Father are bonded, it is clear that their bond is outweighed by Father's inability or unwillingness to parent Child, and by Child's need for permanency. *See C.D.R.*, 111 A.3d at 1220 (concluding that the appellant mother's bond with C.D.R was outweighed by the mother's "repeated failure to remedy her parental incapacity," and by C.D.R.'s need for permanence and stability). Father is not entitled to relief.

Accordingly, because we conclude that the trial court did not abuse its discretion by involuntarily terminating Father's parental rights to Child, and by changing Child's permanency goal to adoption, we affirm the decree and order of the trial court.

Decree affirmed. Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/4/2015

---

*(Footnote Continued)*

formal bonding evaluation be performed by an expert." 958 A.2d at 534 (citation omitted).